## Case No. 2,678.

### CHILDS et al. v. GLADDING et al.

[11 Am. Law Reg. (N. S.) 386; 14 Int. Rev. Rec. 173.]

District Court, D. Rhode Island. June, 1872.

VESSEL OWNERS—RIGHTS OF MAJORITY IN INTEREST.

[A majority in interest of shipowners may dismiss the master, although a co-owner, at any time without cause.]

KNOWLES, District Judge. This is a cause of possession, civil and maritime, promoted by C. T. Childs and others, against Samuel Gladding and others, the libellants,

as owners of twenty-three thirty-second parts of the schooner Allen Middleton, Jr., claiming possession and control of her, as against the respondents, the owners of the remaining nine thirty-second parts.

The libel, as filed on the 12th of April, 1871, alleged as grounds of judicial action, first, the ownership of the schooner, as above stated, and, secondly, "that the libellants are desirous of employing her in the coasting trade, and for this purpose, of placing in her a master satisfactory to themselves, and in whom they have confidence, but that the said Samuel Gladding, having heretofore been master of the said schooner, refuses, though requested to deliver up possession of her to the libellants, and persists in his claim to continue in her as master, notwithstanding the demand made upon him by the libellants for possession and control of her, and he, and some of the other part-owners refuse to unite with the libellants in the employment of said vessel, though, as the libellants believe, a part of the owners, now absent, would join with them in the employment of said vessel, if here present. On the 20th of April, without objection, the libel was amended by inserting three additional articles to the effect following: 1st, that said Gladding was appointed master of the schooner, about the 3d of March, 1871, under a special agreement that he should remain master only so long as he gave satisfaction to the owners, and that before the filing of the libel, "he was informed by the libellants, who constituted a large majority in interest of such owners, that he did not give satisfaction to the owners, and that they had removed him as such master, and demanded of him the possession of said vessel, and to surrender up to them the papers thereof: 2d, that said Gladding, while he was master of said vessel, misused and abused her by greatly overburdening her, whereby she was strained and caused to leak badly and otherwise damaged; and 3d, that said Gladding is incompetent to act as master of said vessel." To the libel, as thus amended, the said Gladding intervening for his interest in the schooner, filed his answer, embodying six defensive allegations, of the first and sixth of which, however, it is not necessary here to speak.

The second was, in substance, that during the months of December, 1870, and January and February, 1871, he acted as agent of all the owners concerned in the purchase of said schooner, who unanimously appointed him master thereof, without any stipulation or condition, and, in consideration thereof, he became part owner; that in a subsequent agreement, on the 3d of March, 1871, a contract concerning the employment of the schooner and the division of her earnings was embodied, and it was expressly stipulated that he, said Gladding, was to act as master of the schooner, as long as he gave satisfaction to the owners—that the meaning of the stipulation was, "that until he, said Gladding, did some act as master that gave the own-

ers just cause of complaint or reasonable ground for dissatisfaction," he was to command and have possession of the schooner; that in pursuance of said agreement he gave up other employments, and on the —— of March, 1871, entered upon his duties as captain and manager of the schooner, having made in her since that date a successful trip to Baltimore, and having settled the accounts of the vessel for that trip with the several shareholders—they "all expressing themselves satisfied;" that he was arranging for and about sailing on a second trip, when the libellants, by instituting these proceedings and arresting the schooner, obstructed the sailing, use and employment of her, to his great damage as one of the owners and master of the same, and in unjust violation and breach of the said contract—he denying that the libellants or owners had any just cause of complaint against, or reasonable ground of dissatisfaction with him for any act done or suffered to be done by him in the command of said schooner, or the management of her affairs or settlement of her accounts.

The third allegation was, in substance, a denial or traverse of the charge of misusing, overloading or straining the vessel: the fourth, in substance, a denial of the charge of incompetency as master of said vessel, coupled with an averment that for over thirty years he had been a mariner by profession,— had served in all capacities (save that of cook) on board of vessels, and had been master of other schooners before, to wit, of the Mary H. Mifflin; Thomas Hallet; Flight; Gov. James Y. Smith; Science, of Bristol; Phoenix, of Stonington; and others, and that no vessel under his command ever had any injury done to her, or any accident happen to her that might have been avoided by the master. The fifth was, substantially, an allegation that he was the legal, bona fide owner of two thirty-second parts of the schooner, and that another thirty-second part is held for him by one William Butler, under an agreement to convey to him on payment of an agreed price.

The cause came to hearing upon libel, answer and documentary and oral proofs, several of the owners, the captain included, appearing as witnesses, and the several points set forth in, or suggested by the libel and answer, were distinctly presented and made the subjects of inquiry and argument. To such only of these as upon full consideration of the whole cause I deem of controlling importance shall I refer, as matters of comment on this occasion. In regard to certain principles or maxims of the law maritime, no question is raised at the bar. The learned counsel of the parties agree that in general the majority in interest of the owners of a vessel are entitled to the control, use and possession of her, and that this right of the majority the admiralty will protect,—of course,—duly regarding the rights of the minority, to demand security for the restoration of their property in specie or otherwise.

Also, they agree that in general the owners of a vessel (that is the majority in interest of them), have the power of appointment and removal of the master at will, for any or no cause, as they may see fit, and that of course no objection of complaint, on the part of a captain, to an exercise of this power by the owners, is of any avail, unless grounded on the terms of some special contract between himself and those owners. But, at this point arises a question upon which the learned counsel are widely at variance, and upon which, it cannot be denied, text writers and jurists seem to be not fully in accord. Thus, on the part of the claimant, it is contended that when it happens that a part-owner, co-operating with the minority, occupies the position of captain, the general principles above stated lose their value for all practical purposes, unless the majority can show some adequate, just or reasonable cause for removing or dispossessing such captain. On the part of the libellants, on the other hand, it is maintained that the right of the majority in interest is as perfect and its power as irresistible, against the captain, though a part-owner, as against any other shareholder, whatever his occupation or his residence— landsman or seaman. And accordingly, as their first position, they claim that upon their petition or libel, as originally filed, in which the only ground for action set forth, is the majority's right of possession, without even an illusion to any cause of dissatisfaction, they are entitled to the relief prayed. On principle, they say, this claim can be sustained, and, while they acknowledge their inability to produce, in support of it, any adjudicated case from the English or American reports, they challenge a production of an adjudicated case militating with their position. In reply to this, and in support of his own position, the learned counsel of the claimant, with apt and cogent remarks and arguments, cites several authorities deservedly of high repute, viz.: 3 Kent, Comm. 162, and notes; Story, Partn. §§ 432, 445, and notes; Fland. Ins. § 65, and notes; 1 Pars. Shipp. & Adm. 95, and notes; Abb. Ins. 104, and notes. On referring to these, we learn that whatever is found in these works sustaining the claimant's views, is assumed and represented to be dictated or warranted by certain three cases in the English Admiralty, in tempore Sir William Scott (1802–10–11). The first of these is The New Draper, 4 C. Rob. Adm. 287. The owners of 9-16ths of a vessel sued for possession the owner of 7-16ths (who also was captain). The suit was contested, on the ground that the captain was in fact the owner of 14-16ths, having paid for seven of the nine shares holden at the commencement of the suit by certain of the libellants. The bills of sale, which he had taken, were, however, deemed by the court defective, and a judgment for possession was entered for the libellants, as being the majority in interest. So far as appears, the only point raised or

discussed was the validity and effect of the alleged purchase of seven shares by the defendant, after suit brought. In pronouncing judgment, the court said: "The dispossession of a master is, in its nature, not an uncommon proceeding. All that the court requires in cases where the master is not an owner, is that the majority of the proprietors should declare their disinclination to continue him in possession. In the case of a master and part-owner, something more is required before the court will proceed to dispossess a person who is also a proprietor in the vessel, and whose possession, therefore, the common law is, upon general principles, inclined to maintain. It is not, however, by any means unprecedented for this court to proceed even to that extent; but then some special reason is commonly stated to induce the court to interpose. I observe there is a reason given in this case, and the same that most frequently occurs, 'that the master is irregular in his accounts with his owners.' " The conclusion of the court's opinion is as follows: "The case becomes, therefore, a common case of the majority of owners proceeding against one in which the common rule of the court must be pursued. Possession decreed." The head note of the case, it may be well to state, is simply "Case of possession. Master dispossessed at the application of a majority of interests." The second of these cases is The Johan & Siegmund, Edw. Adm. 242, decided in 1810, eight years after the decision in The New Draper. The head-note is, "Cause of possession. Suit not entertained by the court in the case of a foreign ship." The only allusion in the report of the case to the point in question, is this single sentence: "If this were a British ship, there can be no doubt that, by the practice of this court, it would, upon the application of a majority of the parties interested, proceed to dispossess the master, though a part-owner, without minutely considering the merits or demerits of his conduct." The third of the three cases is The See Reuter, 1 Dod. 22, decided in 1811. The majority of the owners sought to dispossess the captain, who was also an owner of 5-16ths of the vessel. The decree was against the captain. The only portion of the report of this case, of any pertinence in this connection, is the first sentence of the court's opinion, in these words: "In cases of ships belonging to British subjects (the See Reuter was owned exclusively by aliens), the court has no hesitation in ordering possession to be delivered up on the application of a majority of the owners, without entering very minutely into the causes of dissatisfaction existing between them and the master." That there is found no adjudication in support of the claimant's position is apparent. Nor less apparent is it, that, in the view of the judge, an assignment of a reason for the dispossession of a master part-owner was rather matter of form than substance. In The New Draper, he says

merely that some special reason is "commonly stated"—not that this is necessary, or even important—and his after utterances, in 2 Edwards and 1 Dodson, negative the inference that even he would have sustained a demurrer to a petition in which the majority of part-owners claimed possession, without assigning other cause than the majority's will and order. Assuming, as I am warranted in doing, that no adjudication upon this point adverse to the libellant's position can be produced, and failing to find in the argument of the learned counsel of the claimant, or in the text-books to which reference is made, any sufficient answer to the argument in support of that position, I am constrained to concur in the views of the libellants. No satisfactory reason is assigned or suggested by Sir William Scott, or any commentator, or by the learned counsel of the claimant, for holding that a part-owner of a ship who secures for himself an appointment as master of the craft, is entitled to retain his office and keep possession of the vessel until he shall see fit to resign or surrender, against the expressed will of the majority of the owners,—unless that majority can show reasonable and sufficient cause,—some misfeasance or nonfeasance for his removal and deposition. Of special contracts between a ship's master and a ship's owners I am not now treating, but of the relations between a master who is also a part-owner and his co-owners after his appointment. Is the part-owner who is appointed master of a ship endowed with any new or additional right as a part-owner? When, on his election he steps upon deck, are his relation to the ship and his rights in and over it the same as those of a part-owner of a horse, in his exclusive custody in and over that horse, as settled at common law? To these inquiries it is believed a negative answer must be given. The individual remains a part-owner, with all his rights as such, as before his appointment to the mastership, and no more. As master he is to be regarded simply as the agent of the owners as a body, with no other rights qua master than he would have were he not a shareholder. This, as it seems to me, is, or of right ought to be, regarded as the better law upon the point in question. It is, as is believed, consistent with well-settled and familiar rules and principles, while its opposite leads logically and necessarily to results and conclusions which the profession would be slow to adopt, and the business community quick to condemn. Refraining from further remark upon this point, as supererogatory labor, I sustain the point raised in limine by the libellants as above presented. It is obvious, moreover, that by the amendment of their libel above mentioned it is made to conform to the views of the English jurist. A "special reason" and "causes of dissatisfaction" are set forth; but how "minutely" these causes should be considered—whether as matters of contestation upon proofs and argu-

ment or not—is left by him to the conjectures of his readers.

Of the evidence submitted by the libellants in the case in support of their charges or allegations of incompetency, and of misusing and overstraining the Middleton, it is sufficient here to say that it failed to substantiate those charges when weighed in the balance with the claimant's proofs in rebuttal. Assuming it is proven or admitted, that the libellants are owners of 23-32 of the schooner, and the claimant owner of 2-32 only (the owners of the remaining 7-32 not entering appearance), and that the claimant, though requested, has refused to surrender possession, I must pronounce for the libellants, unless ground for a contrary judgment is found in the second defensive allegation of the claimant's answer, already stated in substance. On recurring to this it is seen that he claims to have been unanimously appointed captain of the Middleton in the winter of 1871, and in proof of this he exhibits the subscription list upon which the owners contracted for their several shares—reading thus: "We, the subscribers, agree to take or hold the respective shares set against our names of schooner Allen Middleton, Jr., said vessel to be commanded by Captain Samuel Gladding. Providence, November 30, 1870." Of this portion of the allegation and its proof I deem it sufficient to say that its relevancy and importance I have failed to perceive, inasmuch as the claimant proceeds to aver that subsequently, viz., on the 3d of March, 1871, a more formal agreement or contract between himself and his co-owners was made, in view of which, as he strenuously contends, the court should refrain from interfering "to aid either party in attempting to violate it." In the construction of this writing referred to, contended for by the claimant, I am unable to concur, and this whether it be considered separately from or in connection with "surrounding circumstances" concerning which testimony was received under objection. The co-owners of the vessel (the claimant among them), on the 3d of March, 1871, convened to ascertain the then will of the then majority in regard to the use of their joint property, and the action and will of the majority, so far as need here be inquired, was embodied in the following paper, to which the signatures of owners of 16-32, and no more, of the vessel (including the claimant owning 2-32) were attached:—

"It is agreed between the owners of schooner Allen Middleton, Jr., and Captain Samuel Gladding, as follows: Captain Gladding is to command the schooner so long as he gives satisfaction to the owners, and she is to be employed in the freighting business between ports not south of Cape Henry, and all northern and eastern ports. The di-

vision of gross earning is to be as follows:— Captain Gladding is to receive 3-5, and the owners 2-5 of the same. Captain Gladding to victual and man the vessel and to sail her, paying all port charges and all other charges appertaining to the running of said vessel, the owners only to pay such bills as are necessarily incurred in keeping the schooner in good running order. Captain Gladding is to make up his account after every trip, and after making deductions named above, he is to divide the balance among the owners. It is agreed that all bills made up for expenditure on the vessel shall, before being charged in Captain Gladding's account, be submitted to Mr. James M. Cross, of Providence, for his approval. Before the vessel leaves Providence all bills against the schooner are to be collected, and accounts made up by Captain Gladding and presented to owners for payment."

It is noticeable that of the seven signatures to this instrument (including Captain Gladding's) four are included among the libellants, and two have disposed of their shares.

For dissenting from the construction given by the claimant to this contract, it seems not necessary to state in full my reasons. It must suffice to say, that even did it bear the signature of each and every owner (instead of only half of them), and were they now, all of them, still owners (which is not the fact), and were there not now (which is the fact) owners who had no interest in the vessel in March last, I should nevertheless hold that the majority in interest is entitled to the possession of the vessel, either as against the claimant alone, captain and part-owner though he be, or against him and his co-owners of the minority. That the co-owners of a ship may not, by contracts and covenants or otherwise, estop themselves from exercising their rights in regard to the appointment or removal of a master, or the control and management of the ship, is not affirmed. It suffices to say that, under the facts in the case, the contract of March 3d, exhibited in proof, lacks more than one of the essentials of a contract of that species. Against any injury or wrong from mere wilfulness, caprice, or favoritism on the part of the majority owners of a ship, the master contracting can protect himself by bond, covenant, or otherwise; and if he neglect thus to guard his interests, himself, not the law, should he blame, if his employers dismiss him at a moment's notice, and without (so far as he may know or is entitled to know) any cause, reasonable or unreasonable.